# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, | |
| *Plaintiff*, | |
| v. | No. 1:19-cv-01672 (GLR) |
| ALEX M. AZAR II, in his official capacity as the Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| *Defendants*. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... v

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 3

    A.    The City of Baltimore's Health Care System ............................................. 3

        1.    The Baltimore City Health Department ........................................ 4

            a)    BCHD's trauma-informed approach to care ..................... 4

            b)    Specific BCHD clinics and programs ............................... 7

        2.    Baltimore City Fire Department's Emergency Medical Services ............... 8

        3.    Baltimore City as self-insurer of employees and retirees ............................ 9

    B.    Existing Laws That Accommodate Conscience Interests and the Delivery of Ethical Health Care ............................................................... 9

        1.    Self-enforcing statutes accommodating conscience interests ................... 10

        2.    Statutes recognizing as paramount the delivery of nondiscriminatory, ethical health care ....................................... 10

    C.    The Unlawful New Rule ............................................................................ 11

LEGAL STANDARD ................................................................................................... 16

ARGUMENT ................................................................................................................ 16

I.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims. ............... 16

    A.    The Rule Is Not in Accordance with Law. ............................................... 17

        1.    The Rule violates the ACA's non-interference mandate. ........................... 17

        2.    The Rule violates EMTALA. ........................................................ 19

        3.    The Rule violates the ACA non-discrimination mandate. ......................... 20

    B.    The Rule Exceeds Statutory Authority. .................................................... 21

1. Congress did not delegate to OCR the Rule's broad enforcement power..................................................................21

2. The Rule expands definitions beyond any scope authorized by statute. ...................................................................22

C. The Rule Is Arbitrary and Capricious. ...................................................24

1. HHS failed to justify departure from prior policy. ....................24

2. HHS failed to consider harm to patient health...........................25

D. The Rule Is Unconstitutional. ...............................................................30

1. The Rule violates the Establishment Clause...............................30

a) The Rule impermissibly imposes the costs and burdens of employees' religious beliefs on patients and other third parties. ..................................................................30

b) The Rule impermissibly coerces patients and health care providers to adhere to the government's favored religious practices .........................................................32

2. The Rule violates the Spending Clause. ......................................33

a) The Rule is unconstitutionally coercive...........................33

b) The Rule is unconstitutionally ambiguous......................34

c) The Rule imposes unconstitutional retroactive conditions. .......................................................................35

d) The Rule lacks a nexus to the federal funds it threatens.................36

II. The City and Its Residents Will Suffer Irreparable Injury.................................36

A. Baltimore Will Suffer Irreparable Harm If It Attempts to Comply. .....................37

1. The City cannot comply with the Rule without sacrificing quality of care. ..........................................................................37

2. Compliance with the Rule will severely harm the City's public health mission. ..........................................................................41

B. Baltimore Will Suffer Irreparable Harm If It Fails to Comply and Loses Federal Funding. ........................................................................43

C. The Rule Will Harm the City as an Insurer. .........................................46

D.      The Establishment Clause Violation is Irreparable Harm as a Matter of Law. ...................................................................................................................46

III.    The Balance of Equities and the Public Interest Favor an Injunction. .............................47

IV.     The Court Should Postpone the Rule's Effective Date or Issue a Nationwide Injunction. ...................................................................................................................48

CONCLUSION......................................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Service, Inc. v. NLRB,*
   522 U.S. 359 (1998)....................................................................................................24

*Aziz v. Trump,*
   234 F. Supp. 3d 724 (E.D. Va. 2017) .......................................................................47

*Burwell v. Hobby Lobby Stores, Inc.,*
   134 S. Ct. 2751 (2014)..............................................................................................30

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
   563 F.3d 847 (9th Cir. 2009) ....................................................................................44

*California v. Azar,*
   19-cv-01184-EMC, 2019 WL 1877392 (N.D. Cal. Apr. 26, 2019)....................19, 29

*Cent. United Life Ins. Co. v. Burwell,*
   827 F.3d 70 (D.C. Cir. 2016) ....................................................................................21

*Chamber of Commerce v. Edmondson,*
   594 F.3d 742 (10th Cir. 2010) ..................................................................................44

*City of Portland v. EPA,*
   507 F.3d 706 (D.C. Cir. 2007)...................................................................................26

*Cutter v. Wilkerson,*
   544 U.S. 709 (2005)...............................................................................................30, 31

*Elrod v. Burns,*
   427 U.S. 347 (1976)..................................................................................................46

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016)...................................................................................24, 25, 26

*Ergon-W. Virginia, Inc. v. EPA,*
   896 F.3d 600 (4th Cir. 2018) ....................................................................................25

*Estate of Thornton v. Caldor,*
   472 U.S. 703 (1985)...............................................................................................31, 32

*F.C.C. v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009)..................................................................................................24

*FDIC v. Meyer,*
    510 U.S. 471 (1994)..................................................................................44

*Havens Realty v. Coleman,*
    455 U.S. 363 (1982)..................................................................................41

*Healthy Teen Network v. Azar,*
    322 F. Supp. 3d 647 (D. Md. 2018)..........................................................35

*Int'l Refugee Assistance Project v. Trump,*
    857 F.3d 554 (4th Cir.), *as amended* (May 31, 2017) *vacated and remanded*
    *on other grounds* ....................................................................................47

*Iowa Utils. Bd. v. F.C.C.,*
    109 F.3d 418 (8th Cir. 1996) ...................................................................45

*Kravitz v. United States Dep't of Commerce,*
    366 F. Supp. 3d 681 (D. Md. 2019) .........................................................25

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986)..................................................................................21

*Larson v. Valente,*
    456 U.S. 228 (1982)..................................................................................30

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)......................................................................47

*Lee v. Weisman,*
    505 U.S. 577 (1992)..................................................................................32

*Legend Night Club v. Miller,*
    637 F.3d 291 (4th Cir. 2011) ...................................................................46

*Mayor & City Council of Baltimore v. Azar,*
    No. 19-cv-1103-RDB, 2019 WL 2298808 (D. Md. May 30, 2019) ............... *passim*

*McCreary Cty. v. ACLU of Ky.,*
    545 U.S. 844 (2005)..................................................................................30

*McGlothlin v. Connors,*
    142 F.R.D. 626 (W.D. Va. 1992)..............................................................37

*Mfrs. Ry. Co. v. Surface Transp. Bd.,*
    676 F.3d 1094 (D.C. Cir. 2012).................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983)........................................................................24, 25, 29

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
   915 F.3d 197 (4th Cir. 2019) ................................................37

*Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*,
   918 F.3d 353 (4th Cir. 2019) ..........................................16, 44

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)..............................................33, 34, 35

*New York v. United States*,
   505 U.S. 144 (1992)..................................................36

*Newsom v. Albemarle Cnty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) ...........................................47

*Nken v. Holder*,
   556 U.S. 418, 435 (2009)..............................................47

*North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*,
   No. 16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ...........41

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013) .........................................44

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ....................................36, 41, 47

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981).....................................................34

*Planned Parenthood of Central North Carolina v. Cansler*,
   804 F. Supp. 2d 482 (M.D.N.C. 2011) .................................45

*Planned Parenthood of Ind. v. Comm'r*,
   699 F.3d 962 (7th Cir. 2012) ..........................................45

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002)...................................................21

*Richmond Med. Ctr. for Women v. Gilmore*,
   11 F. Supp. 2d 795 (E.D. Va. 1998) ...................................37

*Richmond Tenants Org. v. Kemp*,
   956 F.2d 1300 (4th Cir. 1992) .........................................48

*Rosa H. v. San Elizario Indep. Sch. Dist.*,
    106 F.3d 648 (5th Cir. 1997) ............................................... 35

*S. Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................... 33, 36

*Santa Fe Indep. Sch. Dist. v. Doe*,
    530 U.S. 290 (2000) ............................................... 30, 32

*Senior Executives Ass'n v. United States*,
    891 F. Supp. 2d 745 (D. Md. 2012) ............................................... 44

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ............................................... 31

*Smith v. Metro. Sch. Dist. Perry Twp.*,
    128 F.3d 1014 (7th Cir. 1997) ............................................... 35

*Smoking Everywhere, Inc. v. FDA*,
    680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627
    F.3d 891 (D.C. Cir. 2010) ............................................... 45

*State v. U.S. Bureau of Land Mgmt.*,
    277 F. Supp. 3d 1106 (N.D. Cal. 2017) ............................................... 25

*Temple Univ. v. White*,
    941 F.2d 201 (3d Cir. 1991) ............................................... 45

*Texas Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) ............................................... 31

*Trump v. Int'l Refugee Assistance*,
    138 S. Ct. 353 (2017) ............................................... 47

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017) ............................................... 47

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ............................................... 16

*Util. Air Regulatory Grp. v. E.P.A.*,
    573 U.S. 302, 134 S. Ct. 2427 (2014) ............................................... 23, 24

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................... 41

*Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n,*
  263 F.3d 379 (4th Cir. 2001), *overruled on other grounds in The Real Truth*
  *About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544 (4th Cir. 2012) ......................48

*Winter v. Nat. Res. Defense Council, Inc.,*
  555 U.S. 7 (2008) ...........................................................................................................16, 36

## Statutes

5 U.S.C. § 705.................................................................................................................16, 48

5 U.S.C. § 706(2) ................................................................................................... *passim*

42 U.S.C. § 132c-11 ..............................................................................................................10

42 U.S.C. § 238n.............................................................................................................10, 23

42 U.S.C. §§ 300 to 300a-6.....................................................................................................7

42 U.S.C. § 300a-7.........................................................................................................10, 20

42 U.S.C. § 1320a-1(h) .........................................................................................................10

42 U.S.C. § 1395dd.........................................................................................................11, 17

42 U.S.C. § 1395i-5 ..............................................................................................................10

42 U.S.C. § 1395x ..................................................................................................................10

42 U.S.C. § 1396a(a).............................................................................................................10

42 U.S.C. § 2000e(j)..............................................................................................................11

42 U.S.C. § 18023.........................................................................................................10, 11

42 U.S.C. § 18113(a) .............................................................................................................10

42 U.S.C. § 18114......................................................................................................11, 17, 18

42 U.S.C. § 18116..................................................................................................................17

42 U.S.C. § 18116(a).............................................................................................................20

Baltimore City Code Article 4 ..............................................................................................42

Department of Defense and Labor, Health and Human Services, and Education
  Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L.
  No. 115-245, § 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018)..........................................10, 23

Md. Code Ann., Health Gen. § 20-214 ........................................................31

Md. Code Ann., State Gov't § 20-606 ........................................................31

**Regulations**

45 C.F.R. pt. 88 ................................................................ *passim*

73 Fed. Reg. 78072 (Dec. 19, 2008) ........................................................20

76 Fed. Reg. 9968 (Feb. 23, 2011) ...................................................11, 12, 13

83 Fed. Reg. 3880 (Jan. 26, 2018) ...................................................12, 13, 25

84 Fed. Reg. 23170 (May 21, 2019) ............................................ *passim*

Exec. Order No. 13798, 82 Fed. Reg. 21675 (May 8, 2017) ...............................12

**Constitutional Provisions**

Baltimore City Charter, Article II ................................................................3

Baltimore City Charter, Article VII, §§ 54-56 ...............................................4

U.S. Const., Article I, § 8, cl. 1 ................................................................33

**Other Authorities**

Baltimore City Health Department Press Release, *Baltimore City Awarded $5
     Million SAMHSA Grant to Implement Community-Based Trauma Informed
     Care in West Baltimore* (Sept. 15, 2016) .............................................6

Baltimore City Health Department, *State of Health in Baltimore*, May 2018 .............5

Centers for Disease Control and Prevention, *HIV Infection Risk, Prevention, and
     Testing Behaviors Among Men Who Have Sex With Men--National HIV
     Behaviorial Surveillance, 23 U.S. Cities, 2017*, HIV Surveillance Special
     Report 22 (Feb. 2019), https://www.cdc.gov/hiv/library/reports/hiv-
     surveillance.html ................................................................5

Jennifer Frost et al, *Return on Investment: A Fuller Assessment of the Benefits and
     Cost Savings of the US Publicly Funded Family Planning Program*, Wiley
     Periodicals, Inc. (2014) ........................................................46

Wendy Chavkin, et al., "Conscientious Objection and Refusal to Provide
     Reproductive Healthcare: A White Paper Examining Prevalence, Health
     Consequences' and Policy Responses." 123 Int'l J. Gynecol. & Obstet. 3
     (2013) ................................................................18

**Comments on the Proposed Rule**

American College of Emergency Physicians Comment Ltr. (Mar. 27, 2018),
https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71219............................27

American Hospital Association Comment Ltr. (Mar. 26, 2018),
https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65761............................27

American Medical Association Comment Ltr. (Mar. 27, 2018),
https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70564............................26

American Nurses Association and the American Academy of Nursing Comment
Ltr. (Mar. 23, 2018), https://www.regulations.gov/document?D=HHS-OCR-
2018-0002-55870...............................................................................................................28

Association of American Medical Colleges Comment Ltr. (Mar. 26, 2018),
https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67592............................27

National Association of Councils on Developmental Disabilities Comment Ltr.
(Mar. 22, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-
0002-66494 .......................................................................................................................28

Physicians for Reproductive Health Comment Ltr. (Mar. 28, 2018),
https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71284............................28

# INTRODUCTION

The Mayor and City Council of Baltimore ("City of Baltimore" or "City") has spent decades and millions of dollars to protect and improve the health of its uniquely vulnerable residents through its trauma-informed, stigma-free public health mission, administered with over 50% federal funding. Now, a new Health and Human Services (HHS) regulation—*Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23170 *et seq.* (May 21, 2019), to be codified at 45 C.F.R. Part 88 (the "Rule")—threatens to cripple the City's health care system and derail its public health mission by forcing the City to endorse the very stigma it strives to eradicate and destroy the trust the City painstakingly built in its vulnerable communities, or else risk losing all federal funding.

The Rule allows any health care provider, entity, or individual—from front office administrator to ambulance driver—to deny critical health care to patients on the basis of "religious, moral, ethical, or other reasons," without justification, without adequate notice, and without an exception for emergencies or any other provision to ensure the City can provide patients the care they need. The Rule by its terms extends to medical services generally and appears to include health care services for lesbian, gay, bisexual, transgender, and queer or questioning (LGBTQ) individuals, patients struggling with substance abuse, and other vulnerable populations.

The Rule cripples the City's ability to accommodate objections without sacrificing quality care in its clinics and emergency medical services (EMS). Through EMS the City provides emergency care and transport; through the Baltimore City Health Department (BCHD), the City provides not only reproductive health care including abortion referrals, but also HIV/STD treatment and other general and specialized care to stigmatized and vulnerable communities. The Rule appears to require the City to hire employees to work in its clinics or EMS without knowing, or even asking, whether the employee is willing to provide the care that is typical of and critical to

1

the health care entity on a nondiscriminatory basis. The Rule also prohibits making reasonable accommodations to avoid interruption of care from objections. For example, upon learning that an employee of the City's Druid Family Planning Clinic in West Baltimore would be unwilling to provide referrals for the full range of reproductive options or treat LGBTQ individuals, the City would be unable to transfer that employee to a different clinic or position unless the employee agreed.

The Rule threatens sweeping sanctions for failure or suspicion of failure to comply, whether by a recipient of federal funds **or** one of its sub-grantees. The Rule authorizes HHS to withdraw, deny, or terminate federal funds if it determines there has been a failure to comply with the Rule (including certification requirements) or related statutes. Thus, a family planning clinic attempting to make an accommodation for an employee who refused to provide care to LGBTQ individuals could result in the loss of federal funding, not only for that clinic but for the BCHD as a whole.

Approximately half of funding for BCHD's clinics and 75% of funding for the Baltimore City Fire Department's Emergency Medical Services (Fire/EMS) comes from federal funds that would be at risk under the Rule. BCHD and Fire/EMS provide services to thousands of residents of Baltimore and surrounding areas, including some of the most vulnerable segments of the population.

The Rule is unlawful because: (1) it expands beyond recognition the limited accommodations for conscience interests reflected in the statutes it purports to implement; (2) it directly contradicts legal rights to non-discriminatory, quality health care and informed consent; (3) it departs, without valid justification, from the existing statutory and regulatory framework to elevate conscience objections over rights to health care and disregards evidence-based harms from

the Proposed Rule, and is, thus, arbitrary and capricious; and (4) it violates the United States Constitution's Establishment Clause and Spending Clause.

This is a quintessential case for a preliminary injunction. The City has a strong likelihood of success on the merits of its claims under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and the City and the public stand to suffer irreparable harm if the Rule takes effect. The City will face an impossible choice: comply with the Rule by allowing providers to deny care to patients in need, thereby compromising the City's public health mission and obligation to provide ethical care; **or** risk losing critical federal funding for the City's health programs. Either way, the harms—provision of unethical health care, worsening individual health outcomes, unwillingness of vulnerable communities to seek early treatment (which leads to higher costs), and a compromised public health mission, or else possible loss of federal funding and elimination of most health services—will be significant and irreparable. Hence, the Mayor and City Council of Baltimore respectfully requests that the Court enter a preliminary injunction as soon as possible to prevent the Rule from taking effect on July 22, 2019.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  The City of Baltimore's Health Care System

The Baltimore City Charter vests the City with the general power "to provide for the preservation of the health of all persons within the City," Baltimore City Charter, Art. II, § 11. The City Charter also grants the City full "police power." *Id.*, Art. II, § 27; *see also id.*, Art. II, § 47 (empowering the City to "pass any ordinance . . . as it may deem proper in maintaining the . . . health and welfare of Baltimore City."). The City effectuates this mandate through BCHD and its clinics and subgrantees, through Fire/EMS, and as a self-insurer of current and retired City and Police Department of Baltimore City (BPD) employees nationwide.

3

### 1.      The Baltimore City Health Department

BCHD is a City agency tasked with the "general care of, and responsibility for, the study and prevention of disease, epidemics, and nuisances affecting public health." Baltimore City Charter, Art. VII, §§ 54–56. Formed in 1793, BCHD is the oldest continuously operating health department in the United States. It has been working to improve the health and well-being of Baltimore residents for more than 220 years.

BCHD is responsible for protecting public health in a wide range of areas, including acute communicable diseases, chronic disease prevention, HIV/STD prevention and treatment, addiction treatment, reproductive health and family planning, maternal and child health (including pregnancy prevention), school health, adolescent services, senior services, and youth violence prevention. BCHD's mission is to protect health, eliminate disparities, and ensure the well-being of every Baltimore resident through education, advocacy, and delivery of direct services, which it does in collaboration with other City agencies, health care providers, community organizations, and funders. For many of Baltimore's more than 600,000 residents, BCHD is the health care provider of last resort. *See* Declaration of Rebecca Dineen (Dineen Decl.) ¶ 2; Declaration of Adena Greenbaum (Greenbaum Decl.) ¶ 40.

### a)      BCHD's trauma-informed approach to care

The City faces significant public health challenges compared to the rest of the state and the country as a whole. Baltimore has an age-adjusted mortality rate 40% higher than the rest of the state and ranks last on key health outcomes compared to other jurisdictions in Maryland. An estimated 12,500 residents are living with HIV, and Baltimore's HIV diagnosis rate is twice that of the State. An estimated 11% of residents age 12 or older abuse or are dependent on illicit drugs or alcohol; in 2016, Baltimore had the highest age-adjusted overdose mortality rate among large

metropolitan counties in the United States. *See* Declaration of Letitia Dzirasa (Dzirasa Decl.), Ex. A (Baltimore City Health Department, *State of Health in Baltimore*, May 2018).

Many Baltimore residents face systemic social, political, economic, and environmental disparities that have an enormous impact on public health. One in three Baltimore children live below the federal poverty line, and the average life expectancy for children born in Baltimore's poorest neighborhoods is up to 19 years lower than in wealthy areas. Members of historically marginalized groups, especially African Americans and LGBTQ individuals, are also more likely to have poor health outcomes. For example, while African Americans constitute 63% of Baltimore's population, they account for more than 82% of those living with HIV. HIV also disproportionately affects sexual minorities. According to a 2017 federal health survey of 23 United States cities, Baltimore had the highest prevalence of HIV among men who have sex with men. *See* Declaration of Suzanne Sangree (Sangree Decl.), Ex. A (Centers for Disease Control and Prevention, *HIV Infection Risk, Prevention, and Testing Behaviors Among Men Who Have Sex with Men—National HIV Behavioral Surveillance, 23 U.S. Cities, 2017*, HIV Surveillance Special Report 22 (Feb. 2019)).

Baltimore residents with the greatest health needs are often the most difficult to reach through public health intervention. Many Baltimore residents have experienced trauma resulting from discrimination, poverty, homelessness, exposure to physical violence, child abuse and neglect, or involvement in the criminal-justice system, among other adverse experiences. These experiences have made many residents mistrustful of and reluctant to engage with medical providers and public officials. Dineen Decl. ¶¶ 5–6. Many people from marginalized communities who have sought out health care services have been met with judgment and blame by providers, making them less likely to continue to seek care in the future. *Id.* ¶ 8.

When some members of the community do not trust the government to provide them with safe, judgment-free services, the overall public health suffers. Dineen Decl. ¶ 9. Many public health experts, including HHS, recognize that addressing serious public health issues requires dedicated outreach to marginalized populations to ensure that they receive and stay connected to care. *See, e.g.,* Sangree Decl., Ex. C (HHS Trauma Informed Care Toolkit).

BCHD uses a trauma-informed approach to health care, an approach endorsed by HHS. *See id.* ("The practice of trauma informed service is less about 'what' you're doing, and more about 'how' you're doing it."); *see also id.*, Ex. B (Baltimore City Health Department Press Release, *Baltimore City Awarded $5 Million SAMHSA Grant to Implement Community-Based Trauma Informed Care in West Baltimore* (Sept. 15, 2016)). For years, BCHD has dedicated significant resources to implement a trauma-informed approach, which means eliminating stigma associated with particular diseases, conditions, or groups of people, building trust with individuals in targeted communities, providing judgment-free care, and removing as many structural and administrative barriers to care as possible. This approach shapes every aspect of patient interaction across multiple services, including offering mobile van service, posting clear signage, using simple instructions and paperwork, speaking multiple languages, and minimizing all sense of institutionalization. *See* Dineen Decl. ¶¶ 69–71; *see also* Greenbaum Decl. ¶ 60 (clinics do not impose rules on patients that would deter them from seeking care); Dzirasa Decl. ¶¶ 17–18, Ex. B (Baltimore City Health Department Employee Handbook).

Through these actions, BCHD has painstakingly built trust in communities that historically have been marginalized and disenfranchised. For example, in the case of a preteen girl at a Baltimore public school, it took almost a year of outreach and trust-building by BCHD employees at the school before the girl felt comfortable enough to go to a clinic for an STD test, where she

tested positive for chlamydia and received treatment. Dineen Decl. ¶ 86. Any policy change that impedes trust-building efforts in marginalized communities can set public-health programs back years, if not decades. *Id.*; Greenbaum Decl. ¶ 84.

### b)      Specific BCHD clinics and programs

The City operates several clinical services and health programs through two major divisions: the Division of Youth Wellness and Community Health, and the Division of Population Health and Disease Prevention. Dzirasa Decl. ¶¶ 5–7.

**The Division of Youth Wellness and Community Health** includes the Bureaus of Maternal and Child Health (MCH), Chronic Disease Prevention, Office of Youth and Trauma Services, and the Bureau of School Health. MCH operates one community-based adolescent clinic and two comprehensive family planning clinics in West and East Baltimore. Through these clinics, MCH is the major provider of reproductive health services through the Title X Family Planning Program ("Title X") to uninsured, underinsured, and underserved residents, serving primarily African-American and Latinx women. *See* Public Health Service Act (PHSA), 84 Stat.1506, *as amended* 42 U.S.C. §§ 300 to 300a-6; Dineen Decl. ¶¶ 24–37. The Bureau of School Health operates several school-based clinics that provide comprehensive primary care, reproductive health care, and other services to Baltimore students. *Id.* ¶¶ 38–40. MCH's programs are funded in whole or in part by federal funds through Title V, Title X, Head Start, the Office of Adolescent Health, Centers for Disease Control and Prevention grants, and Medicaid reimbursements. *Id.* ¶ 28.

**The Division of Population Health and Disease Prevention** includes the Overdose Prevention program, the Bureau of Clinical Services and HIV Prevention (Clinical Services), and the Bureau of HIV/STD Services. Dzirasa Decl. ¶ 7. Clinical Services oversees two physical locations in the City and two mobile vans offering services that include pre-exposure prophylaxis (PrEP) medication to prevent HIV infection, STD diagnosis and treatment, HIV longitudinal care,

hepatitis C treatment, tuberculosis (TB) screening and treatment, dental care, and buprenorphine treatment (a medically assisted treatment for opioid addiction). Greenbaum Decl. ¶ 21. The clinics are free of charge and handle around 15,000 visits annually. *Id.*¶ 23–54 (describing clinics). The HIV/STD Prevention Program focuses on activities that prevent the spread of sexually transmitted infections, particularly HIV, syphilis, gonorrhea, and chlamydia. This program provides outreach, education, and testing services that are essential to reducing stigma and other barriers to care, and maintaining public health. *Id.* ¶ 48.

The clinics receive significant federal funding under the PHSA, the Ryan White HIV/AIDS Program, and Centers for Disease Control and Prevention grants. Greenbaum Decl. ¶¶ 22, 48. BCHD administers approximately $38 million in federal Ryan White funding and subcontracts with over a dozen entities to provide Ryan White HIV/AIDS services to provide a comprehensive system of primary care, essential support services, and medications for low-income people living with HIV in Baltimore and across Maryland. Dzirasa Decl. ¶ 7.

Clinical Services currently administers over 50 subgrants of federal funds from HHS. These subgrants support outreach, HIV and STD surveillance and prevention, behavioral health, and other programs. Greenbaum ¶ 27.

### 2.      Baltimore City Fire Department's Emergency Medical Services

Fire/EMS operates a fleet of medic units to respond to emergency (911) calls and to provide emergency care and/or transport to appropriate medical care. The City has one of the busiest EMS departments per capita in the nation; calls for emergency medical services are unusually high in Baltimore and have been increasing over the past several years. Between FY2015 and FY2016, Fire/EMS transports in Baltimore increased by nearly 5,918 patients, and the City saw an additional 2,972 patient transports between FY2016 and FY2017. In FY2017, Fire/EMS received an all-time high of 154,621 calls for emergency care and transported 100,894 people to area

hospitals. In FY2018, Fire/EMS received 153,232 emergency calls. For FY2018 transports, Fire/EMS received a total of $19,243,494 in payments, $14,790,374 of which—approximately 76%—came from Medicaid or Medicare payments. *See* Declaration of James Matz (Matz Decl.) ¶ 5.

Fire/EMS also partners with the University of Maryland to administer a two-year pilot program for Mobile Integrated Healthcare in West Baltimore. Matz Decl. ¶ 7. Mobile Integrated Healthcare is a community-based health care solution for areas with a high volume of preventable or unnecessary ambulance trips and limited access to regular care. *Id.* The program provides rapid-response care to "low-acuity" patients (those who need treatment but not an emergency room) and assists in maintaining individuals' health at their homes. *Id.* This model has improved health care access for underserved populations and reduced the strain on overburdened emergency systems. *Id.* The program is funded by a $668,200 grant of federal Medicaid funding provided to through the University of Maryland via the state Health Services Cost Review Commission. *Id.*

### 3.    Baltimore City as self-insurer of employees and retirees

The City is a "self-insured" entity, meaning that the costs of the health care benefits it provides to current and former employees and their families are paid directly by the City. Approximately 12,000 City and BPD employees, 37,000 retirees, and their families receive health care benefits from the City. Declaration of Rajesh Gulhar (Gulhar Decl.) ¶ 2.

### B.    Existing Laws That Accommodate Conscience Interests and the Delivery of Ethical Health Care

Congress has enacted a detailed legal framework preserving patients' rights to informed, nondiscriminatory healthcare while recognizing limited conscience-based objections in healthcare—many of which are further limited to the contexts of abortion, sterilization, assisted suicide, euthanasia, or mercy killing.

## 1.      Self-enforcing statutes accommodating conscience interests

Congress enacted self-enforcing legislation accommodating healthcare providers' conscience interests with respect to specific medical procedures. In particular, the Church Amendments, codified at 42 U.S.C. § 300a-7, address conscience interests in the contexts of abortion and sterilization;[1] the Coats-Snowe Amendment, codified at 42 U.S.C. § 238n, and the Weldon Amendment[2] address conscience interests in the context of abortions; and Sections 1303 and 1553 of the ACA address conscience interests in the context of abortion and assisted suicide, euthanasia, and mercy killing, 42 U.S.C. §§ 18023(a)(1), (b)(1)(A), (b)(4); *id.* § 18113(a). Additional statutes accommodate address conscience interests outside the context of abortions, sterilizations, assisted suicide, and euthanasia in the context of discrete programs or issues, such as vaccination. Many relate only to conditions imposed on "religious nonmedical health care providers." *See, e.g.* 42 U.S.C. § 1320a-1(h); 42 U.S.C. § 132c-11; 42 U.S.C. § 1395i-5; 42 U.S.C. § 1396a(a); 42 U.S.C. §§ 1395x(e) & 1395x(y)(1).

## 2.      Statutes recognizing as paramount the delivery of nondiscriminatory, ethical health care

The statutes accommodating conscience interests in clearly delineated circumstances are part of a larger statutory framework recognizing as paramount patients' right to prompt access to nondiscriminatory medical care. Section 1554 of the ACA limits HHS rulemaking authority by

---

[1] For entities that receive grants or contracts for biomedical or behavioral research, only, the Church Amendments protect "individuals" from having to "perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by [HHS] if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d).

[2] The Weldon Amendment is an appropriations rider that has been included in each HHS appropriations statute enacted since 2004. *See, e.g.*, Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 507(d), 132 Stat. 2981, 3118 (Sept. 28, 2018).

prohibiting any rule that creates unreasonable barriers to health care access or restricts informed consent. *See* 42 U.S.C. § 18114. Section 1557 of the ACA prohibits discrimination in health care on bases recognized in federal civil rights laws. The Emergency Medical Treatment and Labor Act (EMTALA), protects patients' rights to emergency medical care. 42 U.S.C. § 1395dd.[3] The ACA clarifies that conscience exemptions in the abortion context must not "be construed to relieve any health care provider from providing emergency services as required by State or Federal law," including EMTALA. 42 U.S.C. § 18023. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, prohibits discrimination against employees based on their religious beliefs and requires employers to make accommodations only if doing so would not cause "undue hardship" for the employer. 42 U.S.C. § 2000e(j).

### C.      The Unlawful New Rule

The new Rule seeks to supplant the 2011 rule governing implementation of conscience laws through a complaint process in HHS's Office for Civil Rights (OCR). The 2011 rule created the complaint enforcement mechanism for the Church, Weldon, and Coats-Snowe Amendments but removed certain provisions of an earlier regulation that contained definitions of terms, requirements, prohibitions, and a certification requirement. *See* 76 Fed. Reg. 9968 (Feb. 23, 2011). The 2011 rule "partially rescind[ed] [the earlier regulation] based on concerns expressed that it had the potential to negatively impact patient access to contraception and certain other medical services without a basis in federal conscience protection statutes." *Id.* at 9974. Importantly, the 2011 rule clarified that "[f]ederal provider **conscience statutes . . . were never intended to allow**

---

[3] EMTALA defines the term "emergency medical condition" to include "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy . . . ." *Id.* § 1395dd(e)(1)(A).

**providers to refuse to provide medical care to an individual because the individual engaged in behavior the health care provider found objectionable**." *Id.* at 9973–74 (emphasis added). The 2011 rule responded to public concerns that there was "no clear mechanism for a health care provider who believed his or her rights were violated to seek enforcement of those rights," *id.* at 9972, by designating OCR to "receive complaints based on the Federal health care provider conscience protection statutes," and to "coordinate the handling of complaints with [HHS] funding components from which the entity, to which a complaint has been filed, receives funding." *Id*. at 9975, 9977.

The new Rule has its origins in an Executive Order that President Trump signed on May 4, 2017, entitled "Promoting Free Speech and Religious Liberty." Exec. Order No. 13798, 82 Fed. Reg. 21675 (May 8, 2017). On January 18, 2018, the Acting Secretary of HHS established a new Conscience and Religious Freedom Division within OCR with responsibility for enforcing religious-refusal laws. Subsequently, OCR increased the budget of the Conscience and Religious Freedom Division by $1.546 million.

Pursuant to Executive Order 13798, on January 26, 2018, HHS published a Notice of Proposed Rulemaking "to enhance the awareness and enforcement of Federal health care conscience and associated anti-discrimination laws, to further conscience and religious freedom, and to protect the rights of individuals and entities to abstain from certain activities related to health care services without discrimination or retaliation." *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 83 Fed. Reg. 3880, 3881 (proposed Jan. 26, 2018) (the "Proposed Rule"). The Proposed Rule anticipated refusal to provide health care services or research activities on **any ground**—"religious, moral, ethical, or other." *Id.* at 3923.

12

OCR's stated justification for the 2018 Proposed Rule is that, "[s]ince the designation of OCR as the agency with authority to enforce Federal health care conscience laws in 2008, OCR has received a total of forty-four complaints" of violation of conscience interests (in 10 years). 83 Fed. Reg. at 3886. Thirty-four of those complaints were received since the 2016 election. *Id.* From 2008 to 2016—including in the 5 years after the 2011 rule went into effect—OCR received only **1.25 complaints per year**. *Id.* The Proposed Rule describes the procedures undertaken for resolving these complaints and **does not mention how existing procedures for receiving and resolving complaints under the 2011 rule (or before) were deficient.**

HHS received 242,000 public comments, 84 Fed. Reg. at 23180 & n.41, many of which raised concerns about: health consequences and patient burdens resulting from increased stigmatizing denials of medical services and care to vulnerable populations; the Proposed Rule's vague, excessively broad, unworkable requirements; and the Proposed Rule's incompatibility both with medical ethics and federal, state, and local laws, including the U.S. Constitution. *See infra* Section I.C.2.

The final Rule was published in the Federal Register on May 21, 2019. 84 Fed. Reg. 23170 (May 21, 2019). The final Rule is substantially the same as the Proposed Rule.

**First**, the Rule "[e]xpands the regulation's scope," 84 Fed. Reg. at 23227, by expanding definitions of who may deny care and on what basis. Like the Proposed Rule, the Rule purports to "protect the rights of individuals, entities, and health care entities to refuse to perform, assist in the performance of, or undergo certain health care services or research activities to which they may object for religious, moral, ethical, or other reasons." *Id.* at 23263 (to be codified at 45 C.F.R. § 88.1). While the Weldon, Coats-Snowe, and Church Amendments do not define the terms "assist in the performance," or "health care entity," the Rule broadly and vaguely defines "assist in the

performance" to encompass any action with a "specific, reasonable, and articulable connection" to furthering a procedure, health service program, or research activity, including "counseling, referral, training, or otherwise making arrangements." *Id.* In response to comments seeking to delineate the boundaries of the Rule, HHS declined to draw bright lines for an entity seeking to comply, and instead suggested that preparing a room for a procedure, scheduling an appointment, or driving an ambulance *could* all come within the new conscience protections. *See id.* at 23186, 23188.

**Second**, the Rule prohibits employers from ensuring that any religious accommodations preserve continuity of care, and it imposes unworkable administrative requirements. For example, in defining "discriminate or discrimination," the Rule prohibits regulated health care entities from asking, before hiring, whether a prospective employee will object on moral or religious grounds to performing essential job functions; and it requires a "persuasive justification" for inquiring about objections more than once a year even once the employee is hired. 84 Fed. Reg. at 23263 (to be codified at 45 C.F.R. § 88.2). If the employer learns of an objection, an accommodation is allowed only if the objector "voluntarily accepts" it, so an objector may reject any proposed accommodation, no matter how necessary, reasonable, or proportionate. *Id.*

In addition, the Rule conditions continued receipt of federal funding on "[p]rovision of a compliant assurance and certification" of compliance with the Rule and related statutes. 84 Fed. Reg. at 23269 (to be codified at 45 C.F.R. § 88.4). Failure to so certify may result in the same losses of funding and other punitive measures as may be imposed for a substantive violation of the Rule or related statutes. *See id.* at 23272 (to be codified at 45 C.F.R. § 88.7(j)).

**Third,** the Rule authorizes HHS to withhold, deny, suspend, or terminate "Federal financial assistance or other Federal funds" if it determines that there is a "failure to comply." 84

Fed. Reg. at 23271–72 (to be codified at 45 C.F.R. § 88.7(i)(3)). Funds may be withheld even when there are good-faith compliance efforts. *Id.* The Rule "clarifies that recipients are responsible for their own compliance with Federal conscience and anti-discrimination laws and implementing regulations, as well as for ensuring their sub-recipients comply with these laws." *Id.* at 23180.

The Rule does not specify the funds a recipient stands to lose if HHS determines that the recipient or its subrecipient has not complied with the Rule. *See id.* at 23271–72 (to be codified at 45 C.F.R. § 88.7(i)). A finding of violation "threaten[s]" all funding streams implicated by any of the statutes that the Rule purports to implement. *Id*. at 23223. The Rule thus appears to place at risk not only the City's receipt of all federal funds from HHS, but also federal funds from the Department of Labor and Department of Education that are implicated by the Weldon Amendment, including, potentially, funds entirely unrelated to health care. *See* 84 Fed. Reg. at 23172 (Weldon implicates "funds made available in the applicable Labor, HHS, and Education appropriations act"); *id.* at 23265–66, 23272 (to be codified at 45 C.F.R. §§ 88.3(c), 88.7(i)(3)).

The Rule authorizes OCR to conduct broad compliance reviews and "similar procedures," as well as to initiate reviews based on information from a complaint "or other source"—including based on any indication of a "threatened or potential" failure to comply. The process to compel compliance is described by broad reference to three disparate administrative procedures as examples of enforcement powers. *See* 84 Fed. Reg. at 23272 (to be codified at 45 C.F.R. § 88.7(i)(3)) ("[C]ompliance . . . may be effected . . . pursuant to statutes and regulations which govern the administration of contracts (e.g., Federal Acquisition Regulation), grants (e.g., 45 C.F.R Part 75) and Centers for Medicare and Medicaid Services funding arrangements (e.g., the Social Security Act).").

As set forth below, the Rule is contrary to existing law, without authority from the statutes it purports to implement, fails to consider important policy as set forth in thousands of comments received and ignored, and violates the United States Constitution by elevating religious rights over other recognized rights, and placing impermissible conditions on recipients of federal funding.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the APA, a "reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. § 705. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). This remedy is available when "necessary to prevent irreparable injury." 5 U.S.C. § 705.

## ARGUMENT

### I.     Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.

The APA requires that a "reviewing court shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A)–(C). The Rule violates the APA on each of these independent grounds.

A.     **The Rule Is Not in Accordance with Law.**

The Rule violates multiple statutory provisions, including: the ACA's non-interference and non-discrimination mandates, 42 U.S.C. §§ 18114, 18116, and the EMTALA's mandate to provide emergency care, 42 U.S.C. § 1395dd, among others. The Rule must therefore be "held unlawful and set aside." 5 U.S.C. § 706(2)(A).

1.     **The Rule violates the ACA's non-interference mandate.**

The Rule violates every provision of ACA Section 1554. The first three provisions of prohibit HHS from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care"; "impedes timely access to health care services"; or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114.

The creation of unreasonable barriers to access to health care is an inevitable and, indeed, contemplated result of the Rule. The Rule expressly states that "finalizing the rule is appropriate **without regard to whether data exists on the competing contentions about its effect on access to services**" and contends that this view "represents Congress's considered judgment that these rights are worth protecting **even if they impact overall or individual access to a particular service**, such as abortion." 84 Fed. Reg. at 23182 (emphasis added). Medical groups and numerous individual physicians have denounced the Rule as a violation of basic medical ethics. *See infra* Section I.C.2. Courts have found public commentary probative, at the preliminary injunction stage, of whether a regulation violates ACA § 1554. *See Mayor & City Council of Baltimore v. Azar*, No. 19-cv-1103-RDB, 2019 WL 2298808, at *9 (D. Md. May 30, 2019).

HHS wrongly contended that there is "insufficient evidence to conclude that conscience protections have negative effects on access to care." 84 Fed. Reg. at 23251 & n.345. The White Paper HHS cites for this proposition itself recognizes that "conscientious objection … is **one of**

17

**many** barriers to reproductive healthcare." *Id.* (emphasis added). The White Paper states that health care providers should take steps to mitigate these barriers to access by "disclosure to employers and patients, and duties to refer, to impart accurate information, to provide urgently needed care." Sangree Decl., Ex. D (Wendy Chavkin, et al., "Conscientious Objection and Refusal to Provide Reproductive Healthcare: A White Paper Examining Prevalence, Health Consequences' and Policy Responses." 123 Int'l J. Gynecol. & Obstet. 3 at S53 (2013)). The Rule not only fails to implement these disclosure and referral obligations; it affirmatively prohibits them. HHS cannot turn a blind eye to the evidence that the Rule will impede timely access to care and impose unreasonable barriers. *See also* Dzirasa Decl. ¶ 24; Dineen Decl. ¶¶ 79–83; Greenbaum Decl. ¶ 80; Matz Decl. ¶¶ 12–15.

HHS also acknowledges that "in some circumstances, some patients do experience emotional distress as a consequence of providers' exercise of religious beliefs or moral convictions" but declines to "weigh such emotional distress against the right to abide by one's conscience." 84 Fed. Reg. at 23251. This response ignores that when "a provider in declining for reasons of religious belief or moral conviction to perform an objected-to service or procedure . . . express[es] disapprobation of the patient, especially regarding his or her personal identity or personal conceptions of morality," *id.*, that disapprobation inevitably acts as a barrier to health care in vulnerable communities, in violation of ACA § 1554. Dzirasa Decl. ¶¶ 25–26; Dineen Decl. ¶¶ 8, 85; Greenbaum Decl. ¶ 80.

The next three provisions of Section 1554 prohibit rulemaking that "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions" or "violates principles of informed consent and the ethical standards of health care professionals." 42 U.S.C. § 18114. The Rule's allowance for anyone "assist[ing] in the

performance of any lawful health service" to deny care, including "counseling" or "referral," 84

Fed. Reg. at 23263, 23265, will "restrict[] the ability of health care providers to provide full

disclosure," violating the ACA. *See California v. Azar*, 19-cv-01184-EMC, 2019 WL 1877392, at

*24 (N.D. Cal. Apr. 26, 2019) (HHS likely violated Section 1554 where Title X rule "obfuscate[s]

and obstruct patients from receiving information and treatment for their pressing medical needs");

*Baltimore v. Azar*, 2019 WL 2298808, at *9 ("Baltimore City has shown that the Final Rule

[implementing Title X] likely violates the ACA § 1554 by creating unreasonable barriers for

patients to obtain appropriate medical care.").

### 2.     The Rule violates EMTALA.

The Rule gives short shrift to EMTALA, noting only that "where EMTALA might apply

in a particular case, the Department would apply both EMTALA and the relevant law under this

rule harmoniously to the extent possible." 84 Fed. Reg. at 23188. The Rule contains no directive

as to how or even whether emergency care is to be provided when it conflicts with the categorical

refusal-of-care right that the Rule purports to confer on employees. Instead the Rule offers vague

direction that whether refusals are permitted "would depend on the facts and circumstances." *Id.*

at 23263.

The uncertainty of the Rule, with the possibility of draconian sanctions for noncompliance,

is utterly unworkable in practice, particularly in the context of a medical emergency. Matz Decl.

¶¶ 9–10. First responders cannot make advance accommodations for employee refusals, because

the work is unpredictable by nature, and there is no room for staff redundancy on lean mobile

response teams. *Id.* at ¶¶ 13–14; *see also* Greenbaum Decl. ¶ 14. Refusals of service at the scene

of an emergency call would put patients' lives at risk and would violate the basic ethical duty never

to abandon a patient. Matz Decl. ¶¶ 12, 15. Yet, under the Rule, failure to permit employees to

refuse to provide care at the scene could result in catastrophic funding cuts, and a corresponding

decrease in services that would also mean lives lost. *Id*. at ¶ 16. By purporting to extend rights to ambulance drivers among other emergency providers, 84 Fed. Reg. at 23263, without any express exception for emergencies, the Rule directly conflicts with EMTALA.

### 3. The Rule violates the ACA non-discrimination mandate.

The Rule is also unlawful because it appears to permit providers to exclude patients from full and equal healthcare benefits and services, and to permit providers and other healthcare personnel to discriminate on the basis of sex and disability. Section 1557 of the ACA prohibits discrimination under any health program or activity on the basis of classifications listed in four federal civil rights statutes: Title VI of the Civil Rights Act of 1964 (race, color, and national origin); Section 504 of the Rehabilitation Act of 1973 (disability); Title IX of the Education Amendments of 1972 (sex), and the Age Discrimination Act of 1975 (age). 42 U.S.C. § 18116(a).

Whereas the 2008 rule confirmed that it did not authorize prohibited discrimination under federal civil rights laws, the present Rule contains no such assurance. *See* 73 Fed. Reg. 78072 at 78080 (Dec. 19, 2008) ("emphasiz[ing] that the health care conscience protection laws exist as one part of a number of federal laws that address discrimination on a variety of grounds, and that the actions described in the hypothetical situations that violate federal civil rights laws, continue to violate federal civil rights laws."). On the contrary, in response to a public comment that the Rule would negatively impact referral and counseling for LGBTQ persons, HHS did not disagree, but instead stated: "The Department does not pre-judge matters without the benefit of specific facts and circumstances, and particular claims under 42 U.S.C. § 300a–7(d) will be evaluated on a case-by-case basis." 84 Fed. Reg. at 23189. The Rule's encouragement of discrimination violates ACA § 1557.

B.        **The Rule Exceeds Statutory Authority.**

Congress did not delegate to HHS the authority to elevate religious, moral, and other

objections over health care rights, civil rights, and existing enforcement mechanisms for

conscience rights. Nor did Congress delegate the authority to put at risk a sweeping range of federal

funding untethered to the goals of the Rule. Federal agencies "literally [have] no power to act . . .

unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S.

355, 374 (1986); *see also* 5 U.S.C. § 706(2)(C).

1.   **Congress did not delegate to OCR the Rule's broad enforcement power.**

Through the Rule, HHS "provides robust certification and enforcement provisions" and

"sets forth in more detail the investigative and enforcement responsibility of OCR." *See* 84 Fed.

Reg. at 23179. Nothing in any federal statute authorizes the Rule's extraordinarily broad and vague

enforcement scheme authorizing HHS to withhold, deny, suspend, or terminate millions of dollars

in federal health care funds to the City if, in OCR's determination, there is a failure by the City or

its subgrantees to comply with the Rule or any of the underlying statutes. Yet that is the authority

HHS asserts. *See* 84 Fed. Reg. at 23271–72 (to be codified at Section 88.7(i)(3)(i)–(vii)).

Agency action is invalid when it attempts to alter or add additional criteria beyond those in

the governing statute. *See Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 72–73 (D.C. Cir.

2016) (rejecting rule that "amend[ed] the criteria" under the ACA regarding excepted benefits).

*See also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 97 (2002) (An agency exceeds its

authority if it issues a regulation that "effects an impermissible alteration of the statutory

framework."). The Rule's implementation of specific penalties for noncompliance with two dozen

laws, 84 Fed. Reg. at 23272, is unmoored from any statutory text. Although the Weldon

Amendment purports to strip noncompliant entities of federal funding under specifically delineated

circumstances, nothing in that law or elsewhere, supports the sweeping enforcement powers

asserted in the Rule. And nothing in the Weldon Amendment permits the conclusion that Congress authorized use of those enforcement mechanisms to enforce entirely different statutes.

###### 2.     The Rule expands definitions beyond any scope authorized by statute.

The Rule also exceeds statutory authority through its expansive definitions of terms—definitions that go well beyond anything in the statutes. For example, the Rule defines "assist in the performance" to mean "to take an action that has a specific, reasonable, and articulable connection to furthering a procedure," which "may include counseling, referral, . . . or otherwise making arrangements for the procedure . . . depending on whether aid is provided by such actions." 84 Fed. Reg. at 23263 (to be codified at 45 C.F.R. § 88.2). In addition to the broad sweep of the phrase "articulable connection," the term "making arrangements" suggests that minor, incidental, and purely administrative tasks could qualify. The Rule confirms that "preparing a room for an abortion or scheduling an abortion" are covered. 84 Fed. Reg. at 23186. HHS further confirmed the definition's expansive sweep by stating that "assist in the performance" covers "EMTs and paramedics" and could apply to "ambulance crews"—though it "declines to take . . . a categorical approach" regarding these employees. *Id.* at 23188. The Rule thus leaves the requirements so vague that recipients of federal funds will be required to guess at which employees must be permitted to opt out of which tasks relating to provision of, for example, service to a woman with an ectopic pregnancy in need of transportation to the hospital and possibly an emergency abortion.

Additionally, the Rule's definitions expand the right to deny care well beyond the direct medical care and research contemplated in the statutes that HHS purports to enforce. The Rule defines "health care entity" to extend beyond "health care personnel" to include as an "illustrative, not exhaustive" list: pharmacists, pharmacies, medical laboratories, and research facilities; and, for purposes of the Weldon Amendment, health-insurance issuers, health-insurance plans, plan sponsors, and third-party administrators. 84 Fed. Reg. at 23264. This definition is far broader than

the specific definitions of "health care entity" contained in the Coats-Snowe Amendment, *see* 42 U.S.C. § 238n(c)(2) ("an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions"), or the Weldon Amendment, *see* Pub. L. No. 115-245, § 507(d)(2), 132 Stat. at 3118 ("an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan"). And the Rule's definition of "health care entity" appears to expand the applicable statutes beyond recognition, to permit objections by human-resources analysts, customer-service representatives, data-entry clerks, and numerous others who believe that analyzing benefits, answering a benefits-related question, or entering a particular preauthorization for an objected-to procedure, for example, would be inconsistent with their personal beliefs.

The Rule also defines "referral or refer for" broadly to mean "the provision of information in oral, written, or electronic form . . . where the purpose or reasonably foreseeable outcome of provision of the information is to assist a person in receiving funding or financing for, training in, obtaining, or performing a particular health care service, program, activity, or procedure." 84 Fed. Reg. at 23264. Even the posting of notices is considered a "referral." *Id.* The provision of referrals for abortions is an essential service provided in the City's reproductive health care clinics, Dineen Decl. ¶¶ 31, 72. Yet, the Rule appears to permit employees to refuse even to provide information on all options, when requested.

Agency action is unreasonable if it would bring about "an enormous and transformative expansion in [the agency's] regulatory authority" without clear congressional authorization. *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 134 S. Ct. 2427, 2432 (2014) (agency action was unreasonable where the Act made clear that it was designed to apply to, and could not be extended

beyond a "handful" of sources). "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Id.* at 2444. Here, Congress has not assigned to HHS authority to transform the delivery of health care to patients and to redefine and implement two dozen statutes—it certainly has not done so "clearly." The Rule exceeds statutory authority.

## C.    The Rule Is Arbitrary and Capricious.

The Rule is arbitrary and capricious because HHS failed to "give adequate reasons for [their] decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The agency's decision-making "must be logical and rational," *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998); it must be both "reasonable and reasonably explained." *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012) (Kavanaugh, J.). Likewise, agency rulemaking is arbitrary and capricious if, in coming to its decision, the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## 1.    HHS failed to justify departure from prior policy.

When an agency departs from a prior policy, it must "display awareness that it is changing position," show that "there are good reasons" for the reversal, and demonstrate that its new policy is "permissible under the statute." *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). A more "detailed justification" is needed when "serious reliance interests" are at stake. *Id.*;

*accord Encino Motorcars*, 136 S. Ct. at 2126 ("In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.") (citation omitted). The Rule's significant departure from the policy of the 2011 rule will impact the delivery of health care nationwide and the administration of programs accepting federal funds.

The sole justification for this departure is the receipt of 34 complaints of alleged violations of conscience interests from 2016 to 2018—a purported spike from the preceding 8 years, and a total of 44 complaints in 10 years. 83 Fed. Reg. at 3886. The Proposed Rule detailed OCR's handling of the complaints and identified no deficiencies in their handling or resolution. *Id.* An administration change does not authorize an unreasoned reversal of course. *State v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1123 (N.D. Cal. 2017) (a new administration must give reasoned explanations for a policy change and address the findings underpinning a prior rule); *see also Baltimore v. Azar*, 2019 WL 2298808, at *11 ("[W]here, as here, an agency adopts a rule that directly contradicts prior agency conclusions of fact and law, it must acknowledge that it is doing so and give a reasonable justification for the change.").

### 2.      HHS failed to consider harm to patient health.

The Rule is arbitrary and capricious for the additional reason that HHS "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. 29, 43 (1983), and "explain[ed] its decision in a manner contrary to the evidence before it," *Ergon-W. Virginia, Inc. v. EPA*, 896 F.3d 600, 613 (4th Cir. 2018). To comply with Section 706(2)(A), an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted); *Kravitz v. United States Dep't of Commerce*, 366 F. Supp. 3d 681, 746–47 (D. Md. 2019) (finding agency action arbitrary and capricious where the agency's "post-hoc explanation is still

contradicted by the Administrative Record and lacking foundation in the facts."). Despite the substantial funding and critical programs at risk, HHS failed to engage in reasoned decisionmaking, relying instead on conclusory and unsubstantiated statements. Given the "serious reliance interests at stake," HHS's "conclusory statements do not suffice to explain its decision." *Encino Motorcars*, 136 S. Ct. at 2127.

HHS received more than 242,000 public comments in response to the Proposed Rule, 84 Fed. Reg. at 23,180 & n.41, including comments from a broad array of major medical associations, academics, other experts, hospitals, state and local governments, reproductive-rights organizations, children's rights organizations, disease advocates, civil-liberties organizations, academics, and individuals. The commenters raised substantial concerns that the Rule will limit access to health care, especially in the LGBTQ community and among women seeking reproductive health care. *See also* Dzirasa Decl. ¶ 6 (describing populations served by BCHD clinics. An agency must address "significant" comments or those "which, if true, raise points relevant to the agency's decision." *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007); Yet HHS simply ignored a multitude of significant comments, in contravention of that mandate. For example:

- The American Medical Association commented that the Proposed Rule "would undermine patients' access to medical care and information, impose barriers to physicians' and health care institutions' ability to provide treatment, impede advances in biomedical research, and create confusion and uncertainty among physicians, other health care professionals, and health care institutions about their legal and ethical obligations to treat patients."[4]

---

[4]   American   Medical   Association   Comment   Ltr.   (Mar.   27,   2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-70564.

- The Association of American Medical Colleges explained that the Proposed Rule is incongruous with medical professionalism and that it will harm lower-income Americans, racial and ethnic minorities, the LGBTQ community, and patients in rural areas.[5]

- The American College of Emergency Physicians, on behalf of its 37,000 members, concluded that "[d]enial of emergency care or delay in providing emergency services on the basis of race, religion, sexual orientation, gender identity, ethnic background, social status, type of illness, or ability to pay, is unethical."[6]

- The American Hospital Association objected that the Rule's overbroad and expanded definitions risk creating unintended consequences for patient care and run counter to hospital policies not to discriminate in the delivery of emergency, urgent, and necessary care on the basis of a patient's race, color, national origin, citizenship, alienage, religion, creed, sex, sexual orientation, gender identity, age, or disability.[7]

- The American Nurses Association and the American Academy of Nursing expressed concerns that the Proposed Rule would "lead to inordinate discrimination against certain patient populations—namely individuals seeking reproductive health care services and [LGBTQ] individuals." This proliferation of discrimination could "result in reduced access

---

[5] Association of American Medical Colleges Comment Ltr. (Mar. 26, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-67592.

[6] American College of Emergency Physicians Comment Ltr. (Mar. 27, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71219

[7] American Hospital Association Comment Ltr. (Mar. 26, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-65761.

to crucial and medically necessary health care services and the further exacerbation of health disparities between these groups and the overall population."[8]

- Physicians for Reproductive Health warned that the Proposed Rule unlawfully exceeds HHS's authority by impermissibly expanding federal conscience laws, creates barriers to health care and exacerbates already existing inequities, and will cause severe consequences for providers while undermining the provider-patient relationship.[9]

- The National Association of Councils on Developmental Disabilities opposed the Proposed Rule because it would "introduce broad and poorly defined language," is "vague and confusing," and "[m]ost important, . . . the regulations fail to account for the significant burden that will be imposed on patients, a burden that will fall disproportionately and most harshly on women, people of color, people living with disabilities, and [LGBTQ] individuals. These communities already experience severe health disparities and discrimination, conditions that will be exacerbated by the proposed rule, possibly ending in in poorer health outcomes."[10]

HHS's conclusory non-response to the public comments is that the Rule could just as easily increase access to healthcare as decrease it—an assertion that is not only unsubstantiated but also contradicted by the evidence in the administrative record. Specifically, the agency says that it "expects any decrease in access to care to be outweighed by significant overall increases in access generated" by the Rule because the Rule will supposedly allow objecting practitioners to continue

---

[8] American Nurses Association and the American Academy of Nursing Comment Ltr. (Mar. 23, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-55870.

[9] Physicians for Reproductive Health Comment Ltr. (Mar. 28, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-71284.

[10] National Association of Councils on Developmental Disabilities Comment Ltr. (Mar. 22, 2018), https://www.regulations.gov/document?D=HHS-OCR-2018-0002-66494.

in the practice of medicine (or to enter the field). 84 Fed. Reg. at 23252 & n.347. The sole evidence to which the agency points, however, is an advocacy group's decade-old, online survey of members of faith-based organizations, a large percentage of which said they were "very" or "somewhat" likely to limit the scope of their practice if a 2008 conscience rule was rescinded.[11] *Id.* HHS cites no evidence (1) that survey results for members of **faith-based** medical organizations are representative, (2) that the online survey even attempted methodological rigor, including adjusting for biases in the population surveyed and the subset that responded, or (3) that there was any actual decrease in access to care—much less an exodus of providers—when the 2008 rule was rescinded. *See id.*

It was unreasonable for HHS to credit an outdated, unrepresentative, and speculative survey and to disregard the overwhelming evidence, in detailed comments from the nation's major medical organizations, raising grave concerns about the legality and reasonableness of the proposed regulation and opining that the Rule will significantly decrease access to care. HHS's determination that the Rule will increase access straightforwardly "runs counter to the evidence before the agency" and is therefore arbitrary and capricious. *State Farm*, 463 U.S. at 43; *see also California*, 2019 WL 1877392 at *38 (rejecting Defendants' unsubstantiated claims that other providers are "waiting in the wings" to fill the void left by their Title X rule).

---

[11] The survey was fielded March 31, 2009 to April 3, 2009 and was extremely limited: it was completed by 2,865 members of the Christian Medical and Dental Association (CMDA), 400 members of the Catholic Medical Association (CMA), 69 members of the Fellowship of Christian Physicians Assistants, 206 members of the Christian Pharmacists Fellowship International, and 8 members of Nurses Christian Fellowship. https://www.freedom2care.org/polling. The poll was taken again in May 2011, *id.*, and, again, there is no evidence of any decrease in care.

**D.       The Rule Is Unconstitutional.**

Agency action is invalid under the APA if it is it contrary to constitutional right, power, privilege or immunity. 5 U.S.C. § 706(2)(B). The Rule violates the Constitution's Establishment Clause and Spending Clause. It is therefore invalid.

**1.       The Rule violates the Establishment Clause.**

The Establishment Clause bars official conduct that favors one faith over others, has the primary purpose or primary effect of advancing or endorsing religion, or coerces religious belief or practice. *See, e.g.*, *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000). The Rule officially prefers the religious beliefs of objectors over the rights and beliefs of providers and patients, and it coerces religious exercise by requiring providers and patients to act in accordance with objecting employees' religious beliefs. The Rule's favoritism toward religious beliefs invoked by objecting employees is subject to strict scrutiny. *See Larson v. Valente*, 456 U.S. 228, 246 (1982). The Rule cannot survive that, or any, scrutiny because, among other reasons, there are obvious less-restrictive alternatives for accommodating objecting employees, including existing policies that the City, its subgrantees, and other healthcare entities nationwide already employ.

**a)       The Rule impermissibly imposes the costs and burdens of employees' religious beliefs on patients and other third parties.**

The Rule violates the Establishment Clause because it imposes costs, burdens, and harms on health care providers and patients for the purpose of facilitating the religious beliefs and practices of objecting employees. The Establishment Clause prohibits religious exemptions or accommodations by government that would have a "detrimental effect on any third party." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2781 n.37 (2014); *see also Cutter v. Wilkerson*, 544 U.S. 709, 720 (2005). That is because religious exemptions that burden third parties impermissibly

prefer the religion of those who are benefited over the beliefs and interests of those who are not. *See, e.g.*, *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989) (plurality opinion).

The prohibition against harming third parties is well-settled. In *Estate of Thornton v. Caldor*, 472 U.S. 703 (1985), the Court invalidated a state law requiring employers to accommodate people observing the Sabbath in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." *Id.* at 709; *see also Texas Monthly*, 489 U.S. at 15, 18 n.8 (plurality opinion) (invalidating tax exemption for religious periodicals because it increased taxes on nonbeneficiaries); *cf. Sherbert v. Verner*, 374 U.S. 398, 409 (1963) (permitting religious accommodation for employee who was fired for refusing to work on her Sabbath because it would not "abridge any other person's religious liberties").

In evaluating Establishment Clause challenges, courts must "account [for] the burdens a requested accommodation may impose on nonbeneficiaries" and ensure that the accommodation does not "override other significant interests." *Cutter*, 544 U.S. at 720, 722. The City and Maryland have laws and policies, consistent with existing federal law, to ensure that they can deliver care to their patients while also respecting employees' religious beliefs.[12] *See* Dzirasa Decl. ¶¶ 15–19. The Rule undermines essential patient protections by inviting employees, contractors, and volunteers of health care institutions to deny care to patients based on religious, moral, or other objections

---

[12] For example, Maryland law prohibits employers from discriminating against any individual with respect to religion, except when providing a notice or advertisement indicating a bona fide occupational qualification for employment, *see* Md. Code Ann., State Gov't § 20-606; and provides that a person may not be required "to perform or participate in, or refer to any source for, any medical procedure that results in artificial insemination, sterilization, or termination of pregnancy," except insofar as "the failure to refer a patient to a source for any medical procedure that results in sterilization or termination of pregnancy" would be the cause of death or serious physical injury or serious long-lasting injury to the patient or otherwise contrary to the standards of medical care, Md. Code. Ann., Health Gen. § 20-214.

either to the treatment or to the characteristics or circumstances of the patient, without regard to the burdens and harms they will impose on patients and providers.

The Rule hamstrings the City's ability to make appropriate accommodations for objecting providers, and hence refusals will result in delays or denials of care. As set forth in Section II, *infra*, the Rule's elevation of certain religious rights over all else places the City in an impossible bind—no matter whether the City complies with the Rule or forgoes federal funding, Baltimore residents, the City fisc, and the City's public health will be unreasonably burdened and suffer significant harm. *See* Dzirasa ¶¶ 25–28, 31; Greenbaum ¶¶ 83–86; Dineen ¶ 81–89; Matz Decl. ¶¶ 9–16; *see also infra* Section II (discussing irreparable harm); Section I.C.2 (comments discussing harm to vulnerable populations). The Rule thus violates the Establishment Clause's prohibition against governmental mandates under which "religious concerns automatically control over all secular concerns." *Caldor*, 472 U.S. at 709.

> **b)** **The Rule impermissibly coerces patients and health care providers to adhere to the government's favored religious practices**

The Rule also impermissibly uses the government's authority to coerce the City and its patients to act in accordance with the religious beliefs and practices of objecting employees. "[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992); *see Santa Fe*, 530 U.S. at 312. Yet the Rule allows individual employees to dictate whether and how patients receive health care based on their own personal religious views. That is true even when those beliefs are expressly contrary to the mission of the BCHD and its programs or the patient's own beliefs. For example, women who seek reproductive health care at a clinic that provides family-planning services may be denied care based on the religious views of a single employee, or they may receive skewed

advice based on the employee's religious beliefs rather than medical protocol. *See* Dineen Decl. ¶ 86. This violates the Establishment Clause.

### 2. The Rule violates the Spending Clause.

Under the Spending Clause, U.S. Const., art. I, § 8, cl. 1, Congress must not impose conditions on federal funds that are (1) so coercive that they compel (rather than encourage) recipients to comply, (2) ambiguous, (3) retroactive, or (4) unrelated to the federal interest in a particular program. *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 575–78 (2012); *S. Dakota v. Dole*, 483 U.S. 203, 206–08 (1987). Conditioning the City's receipt of federal funds on compliance with the Rule would violate all these limitations.

### a) The Rule is unconstitutionally coercive.

The Rule threatening to strip all federal funding if OCR deems the Rule violated is an unconstitutionally coercive "gun to the head." *NFIB*, 567 U.S. at 581. Because federal funding accounts for approximately 50% of BCHD's budget and 75% of Fire/EMS's budget—the threatened loss of federal funding leaves the City "with no real option but to acquiesce." *Id*. at 581–82. The Rule threatens not only Medicaid funding, as in *NFIB*, but all federal funding, under a vast array of health, education, and employment programs, including over half the funds for BCHD. *Id*. at 581–82. *See* Dzirasa Decl. ¶ 3; Greenbaum Decl. ¶ 22; Dineen Decl. ¶ 28; Matz Decl. ¶ 6. Hence, the Rule violates the Spending Clause: Congress may not "penalize [recipients] that choose not to participate in [a] new program by taking away their existing [] funding." *NFIB*, 567 U.S. at 585.

The Rule's unbounded enforcement authority, *see* 84 Fed. Reg. at 23272, which expands the Weldon Amendment's context-specific (that is, limited to abortion) consequences to two dozen now-expanded federal conscience laws across the range of health care service, and the vague scope of the Rule's mandate, both multiply the Rule's coercive effect. Given the millions of dollars in

funding at stake, the loss of which would decimate the delivery of health care to one of the country's most vulnerable cities, the Rule constitutes "economic dragooning" rather than "relatively mild encouragement" to comply. *See NFIB*, 567 U.S. at 581–82. For that reason, the City is likely to succeed in showing that the Rule is unconstitutionally coercive.

### b)      The Rule is unconstitutionally ambiguous.

Additionally, if Congress desires to condition the States' receipt of federal funds, it "must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* The Rule's expansive and vague definitions, untethered to prior constructions of the relevant statutes, give entities seeking to comply little to no guidance on what is expected. For example, the Rule purports to allow any "health care personnel" to refuse to provide medical care or to perform any action that has an "articulable connection" to furthering a procedure on the basis of religious, ethical, or "other reasons," without providing any information to the patient about the patient's medical condition or treatment options. 84 Fed. Reg. at 23263. HHS compounds this ambiguity by responding to comments seeking clarity about the Rule's scope by saying that the issues must be resolved on a case-by-case basis depending on the facts and circumstances. *Id.* at 23188, 23189, 23205. The City cannot make knowing choices about its conduct with respect to treatment of providers' denials of care to vulnerable residents and the limitations on the City's policies and actions that come with federal funding when HHS refuses to make clear what those limitations are.

In addition, the Rule makes the City responsible for policing its subgrantees' compliance. 84 Fed. Reg. at 23180 ("[R]ecipients are responsible for their own compliance with Federal

conscience and anti-discrimination laws and implementing regulations, as well as for ensuring their sub-recipients comply with these laws."). Thus, the City could be found in violation of the Rule if a sub-grantee is found in violation, regardless of whether the City was put on notice of such violation. The Spending Clause does not allow such an outcome. *See Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1030 (7th Cir. 1997) (holding that "[t]o impute liability to a program or activity" based on one person's actions, "even if [the government entity] acted without notice" of the person's actions, "cannot be used to support a monetary award in a Spending Clause case"); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 654 (5th Cir. 1997) ("As a statute enacted under the Spending Clause, Title IX should not generate liability unless the recipient of federal funds agreed to assume the liability."). Terminating the City's funding based on the conduct of third-party subgrantees, as the Rule purports to do, would create such an unsure stream of funding that it would be financially paralyzing for the City. Greenbaum Decl. ¶¶ 76–78 (discussing City's reliance on small sub-grantees).

### c) The Rule imposes unconstitutional retroactive conditions.

Relatedly, the federal government cannot "surpris[e] participating States with post-acceptance or 'retroactive' conditions." *NFIB*, 567 U.S. at 582–83 (requirement violated where the Medicaid expansion was a shift not merely in degree, but in kind, even where Congress had authority to "alter, amend, or repeal" the laws). City agencies accept and plan for the receipt of federal funding with the expectation that they will receive the funds under existing agreements— and in accordance with the terms and conditions of existing federal programs. *See Healthy Teen Network v. Azar,* 322 F. Supp. 3d 647, 654–55 (D. Md. 2018) (noting that multi-year agreements "give the grantee organization some assurance that . . . they can plan for the necessary staff and facilities to carry out the grant's purpose). The BCHD and Fire/EMS programs would be crippled by being unable to expend anticipated funds because they cannot absorb such a loss of funding

without a reduction in staffing, programs, and services. *See* Dzirasa Decl. ¶ 31; Matz Decl. ¶ 12. And the situation for the City is all the more untenable because of HHS's insistence that it can and will define what constitutes a violation only after the fact, in retrospective enforcement proceedings.

### d) The Rule lacks a nexus to the federal funds it threatens.

Finally, the Spending Clause requires that funding conditions "bear some relationship to the purpose of the federal spending," *New York v. United States*, 505 U.S. 144, 167 (1992), and be "reasonably calculated" to address the "particular . . . purpose for which the funds are expended," *Dole*, 483 U.S. at 208–09. "Conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Id*. at 207 (quotations omitted). The Rule places various federal grants and reimbursements—such as those for HIV/STD prevention, emergency health care and transport, and reproductive health care—at risk even though the purposes of those statutes are wholly unrelated to the protection of conscience objections. The Rule purports even to jeopardize funding for the City's labor and educational programs—programs with no relationship whatsoever to the Rule's health care conscience restrictions.

## II.     The City and Its Residents Will Suffer Irreparable Injury.

The City and its residents will suffer ongoing and irreparable harm if the Rule is allowed to take effect on July 22, 2019. "[A] party seeking a preliminary injunction must prove that he or she is 'likely to suffer irreparable harm in the absence of preliminary relief.'" *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) (quoting *Winter*, 555 U.S. at 20). In this Circuit, there is irreparable injury when a movant makes a "clear showing" of "actual and imminent" harm that "cannot be fully rectified by the final judgment after trial," including economic harms if damages are not recoverable or could not undo a permanent harm resulting from a temporary loss of funds.

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d

197, 216–18 (4th Cir. 2019).

If the Rule goes into effect, the City will have two choices: (1) attempt to comply with the

Rule and allow its employees to refuse to provide care, resulting in the unethical practice of

medicine and endangering the lives of patients and residents, or (2) fail to comply and

disproportionately risk losing crucial federal funding, which would cripple the City's ability to

provide critical care to its most vulnerable populations. No matter what the City decides, the Final

Rule will cause irreparable harm. *See* Dzirasa Decl. ¶¶ 28–31; Matz Decl. ¶¶ 9–16.

**A.      Baltimore Will Suffer Irreparable Harm If It Attempts to Comply.**

If the City attempts to comply with the Rule, its medical providers would be forced to

contravene their ethical obligations to provide patient-centered care. BCHD and Fire/EMS lack

the resources to comply with the Rule without leaving gaps in health care—gaps that will

inevitably result in the provision of inferior care and worse health outcomes, and will greatly harm

the City's public health mission.

**1.      The City cannot comply with the Rule without sacrificing quality of care.**

Harm to the provider-patient relationship inherent in forcing a medical provider to give—

and a patient to receive—care that falls below the standard required by professional ethics and best

practices is irreparable. *See, e.g.*, *Baltimore v. Azar*, 2019 WL 2298808, at *12 (*citing Richmond

Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 809 (E.D. Va. 1998) (irreparable injury

where physicians would be "constrained to alter their medical advice to, and their medical care of,

their patients contrary to their best judgments"); *McGlothlin v. Connors*, 142 F.R.D. 626, 642

(W.D. Va. 1992) ("[T]he threat of future denial of health benefits represents a sufficient direct

threat of personal detriment.") (citation omitted). The Rule's unqualified refusal rights would

undermine the practical ability to provide prompt, non-discriminatory care in conformance with professional standards. Employee refusals under the Rule will result in denials of timely care to Baltimore residents, in City programs and elsewhere, and will hamper the City's delivery of quality health care, which will result in significant harm for individual patients and for public health at the population level.

**BCHD**

The Rule will be costly, if not impossible for BCHD to administer, which will result in gaps in services. Greenbaum Decl. ¶¶ 73–75. Employees of BCHD clinics perform work that is highly targeted and involves the same types of services every day. *Id.* ¶ 73. Therefore, a provider or staff member objecting to assisting in the provision of a service or to helping a particular patient demographic would necessarily refuse to perform a significant portion of his or her job duties. *Id.* Without being able to fill that position with someone willing to perform critical job duties, BCHD's only alternative would be to double-staff the clinics. *Id.* Adding such redundancy is financially impossible, as the City's clinical and other programs are already understaffed and underfunded. *Id.*; Dineen Decl. ¶ 80.

The City's hiring processes for health care workers make it uniquely vulnerable to harm from the Rule's mandate to accommodate objectors above all else. Most City job openings are listed on a central City Human Resources Department website and describe the open positions in general terms. Greenbaum Decl. ¶ 14. Applicants learn of the specific job duties of the position and the services that they would be asked to provide only during the interview for the position. Thus, applicants who would object to providing certain services or treating some subpopulations might not know that a job to which they were applying required them to perform objected-to services for objected-to patients until at least partway through the hiring process. *Id.*

Unlike at many private clinics whose mission statements make explicit that they are devoted to serving historically underserved or stigmatized populations or to providing health procedures that some other providers might find objectionable, applicants to BCHD, Fire/EMS, and other City health care entities may not share in or even know of the City's public health mission, and may bring with them any number of religious, moral, or personal views about individual choices, minority groups, or health care procedures. A rule requiring the City to hire persons to perform services that those individuals have no intention of performing would be unworkable.

An added hurdle to staffing is the specialized training requirements in some of BCHD's clinics. Greenbaum Decl. ¶ 74. To prescribe buprenorphine, for example, medical professionals are legally required to undergo specialized training. *Id.* And once certified, providers may treat only up to a maximum number of patients depending on the level of certification. *Id.* Similarly, TB treatment is highly specialized, and new nurses must train for up to six months before they can provide the full spectrum of care for TB patients. *Id.* Providers at the reproductive health clinics must also complete specialized training in order to prescribe and administer long-acting reversal contraceptives. *Id.* Thus, even if funding could be secured, accommodating staff refusals in these clinics would create a gap in services before new staff could be put in place. In the interim, patients would suffer, unintended pregnancies would increase, drug overdoses would increase, and STD/HIV and TB cases would increase, potentially leading to outbreaks. *Id.*

The subgrantee compliance certification that the Rule appears to require would also create unmanageable administrative burdens. Greenbaum Decl. ¶ 75. Currently BCHD ensures that its subgrantees comply with federal law as required by the terms of the subgranted federal funding. *Id.* However, BCHD lacks staff resources to additionally review and monitor the internal personnel

policies and procedures of its subgrantees to ensure they are organizing their health care to prioritize employee objections over patient care. *Id.*

In addition, BCHD's strategy for expanding outreach to underserved populations is increasingly to subgrant federal funds to small, community-based organizations. Greenbaum Decl. ¶ 76. These smaller organizations tend to be new and have few paid staff members, but they know, and are trusted by, their client populations. *Id.* ¶ 77. The nature of these organizations complements BCHD's patient-centered philosophy by allowing outreach and services to be provided by members of the patients' own communities. But because of their inexperience and lack of resources, these small organizations sometimes lack processes that would allow the BCHD to ensure that their internal personnel policies comply with the Rule. *Id.* ¶ 78.

### FIRE/EMS

Fire/EMS would face similar barriers to complying with the Rule without sacrificing ethical health care. EMTs are dispatched for emergency care based on the 911 callers' report of what the injured person needs and the proximity of a Fire/EMS resource. Time is of the essence. If, upon arrival at the scene, any Fire/EMS employee were entitled to refuse to provide care, there would be no alternative care immediately available. People will die as a result. *See* Matz Decl. ¶¶ 11–15. Fire/EMS has neither the funding nor the logistical capacity to staff every ambulance and every fire truck with multiple EMS employees to cover every possible objection by any employee, including the possibilities that the person in crisis could be gay, transgender, experiencing an ectopic pregnancy, an intravenous-drug user, a sex worker, or some other person or condition objectionable to a particular EMS employee for whatever reason. Matz Decl. ¶¶ 14–15.

Because the City's health care providers lack the resources to double-staff at clinics and Fire/EMS or otherwise avoid gaps in health care from refusals, the City will be hampered in its

ability to provide nondiscriminatory, quality care to residents of Baltimore and the surrounding areas, including some of the most vulnerable members of society. This will harm BCHD and Fire/EMS, constraining the ability to provide ethical, patient-centered care. *Baltimore v. Azar*, 2019 WL 2298808, at *12. And as set forth below, the public health consequences will be severe and irreparable.

> **2.    Compliance with the Rule will severely harm the City's public health mission.**

The City's public health mission will be irreparably harmed by the Rule should it take effect. This Circuit has held that "beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care." *Pashby*, 709 F.3d at 329. "Ongoing harms to a [plaintiff's] organizational mission[]" likewise establishes a likelihood of irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*, No. 16-cv-1274, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016) ("The NAACP has likewise demonstrated that they will face irreparable harm if an injunction does not issue. An organization has been harmed in its own right if the defendant's actions 'perceptibly impaired' the organization's programs, making it more difficult to carry out its mission.") (citing *Havens Realty v. Coleman*, 455 U.S. 363, 379 (1982)).

The Rule threatens to undermine BCHD's mission to "protect health, eliminate disparities, and ensure the well-being of every Baltimore resident through education, advocacy, and direct service delivery." Dzirasa Decl. ¶ 4. The Rule requires BCHD and Fire/EMS to endorse the very stigma that the City has painstakingly sought to eradicate through its trauma-informed approach to care. This approach has succeeded by establishing trust with patients and patient communities

over time, sometimes over the course of years. That trust can collapse in the single moment it takes for a patient to be turned away. Dineen Decl. ¶ 85; Greenbaum Decl. ¶ 4.

If health care staff refuse to treat patients for religious, moral, or "other" reasons based on patients' identity or the services sought, it would inherently communicate a sense of judgment and disapprobation to those who are denied care. Patients who have faced a lifetime of discrimination and trauma will be particularly vulnerable to the stigma and psychological harms of such refusals. Already traumatized patients will lose trust in their providers and in the City more generally, and will be deterred from seeking care in the future. The stigmatizing effects of being denied care that one individual experiences will ripple out through word of mouth in that person's community, leaving others, once again, mistrustful of government health care programs and reluctant to seek care. Inevitably the Rule would undermine BCHD's and the City's reputation in hard-to-reach communities where health disparities are the greatest. Greenbaum Decl. ¶ 83; Dzirasa Decl. ¶ 26.

For example, BCHD clinics display notices to patients that they will receive care without discrimination on the basis of their race, color, national origin, age, gender, sexual orientation, gender identity or expression, physical or mental disability, religion, ethnicity, language, or inability to pay.[13] Greenbaum Decl. ¶ 61. However, if the Rule is permitted to take effect, Baltimore residents may view alongside such notice, a notice to health care employees that:

> You may have the right under Federal law to decline to perform, assist in the performance of, refer for, undergo, or pay for certain health care-related treatments, research, or services (such as abortion or assisted suicide, among others) that violate your conscience, religious beliefs, or moral convictions.

---

[13] The City of Baltimore's Community Relations law prohibits discrimination in many contexts, including health care, where discrimination is defined as "any difference in the treatment of an individual or person because of race, color, religion, national origin, ancestry, sex, marital status, physical or mental disability, sexual orientation, gender identity or expression." Baltimore City Code Article 4, § 1-1(f)(1); *id.* § 3-4 (addressing health care specifically).

84 Fed. Reg. at 23272 (Appendix A). While such notice is not required under the Rule, voluntary posting of "notice concerning Federal conscience and anti-discrimination laws" will be "non-dispositive evidence of compliance." 84 Fed. Reg. at 23216. Given the risk of loss of federal funding, the City may feel no choice but to comply.

Any policy change that impedes trust-building efforts in marginalized communities can set public-health programs back decades. Dineen Decl. ¶ 86; Greenbaum Decl. ¶84. Disruptions in care for high-risk groups threaten the broader population with devastating harms, including increased prevalence of communicable diseases like tuberculosis, HIV, and sexually transmitted diseases, as well as teen pregnancies, infant deaths, and opioid overdoses. Dzirasa Decl. ¶ 28; Greenbaum Decl. ¶ 20. BCHD's clinics are often facilities of last resort—safety nets —for Baltimore's most at-need residents. Dzirasa Decl. ¶ 24. If BCHD can no longer provide judgment-free health care, these individuals will forgo necessary preventive and other health care, resulting in worse and more costly health outcomes. *Id.* ¶ 26; Greenbaum Decl. ¶ 80. Even those who have access to health care elsewhere sometimes choose to come to the BCHD for services because they are too embarrassed to seek those services from their primary-care providers. If the Rule takes effect and more health care providers restrict access based on "conscience" objections, the numbers of individuals forgoing care may rise even further. The City will ultimately end up bearing the long-term costs resulting from the loss of patients' timely access to effective preventive healthcare.

**B.     Baltimore Will Suffer Irreparable Harm If It Fails to Comply and Loses Federal Funding.**

If the costs of compliance are impossibly high, the potential costs of non-compliance are worse. Failure to comply whether consciously or by inadvertently running afoul of the Rule's

vague and sweeping requirements, could mean the loss of millions of dollars in federal grant funding that would cripple the City's ability to provide essential health services. The Rule allows HHS to withdraw, deny, terminate, and even purportedly claw back Medicare and Medicaid reimbursements and all other federal funds if HHS determines there has been a failure to comply with the Rule or the statutes on which it is purportedly based. These penalties could be applied for even a single violation or a violation by a different entity, such as a subgrantee private clinic. For the City, this means the potential loss of millions of dollars in federal funding, including over half the BCHD budget, over 75% of the emergency medical services budget, and the defunding of critical programs such as HIV and STD prevention and treatment; reproductive health and family planning; tuberculosis screening, treatment, and control; addiction treatment; immunizations; and emergency-room diversion and care.

Even purely economic harm, such as the City's loss of funding, constitutes irreparable injury for purposes of preliminary injunction if "monetary damages will be unable to remedy financial losses when litigation ends" or when "temporary delay in recovery somehow translates into permanent injury—threatening a party's very existence by, for instance, driving it out of business." *Mountain Valley Pipeline*, 915 F.3d at 217–18. Both factors are present here. Baltimore cannot recover damages for its forgone federal funding because HHS's sovereign immunity precludes monetary recovery. *Id.*; *see also, e.g.*, *Baltimore v. Azar*, 2019 WL 2298808, at *12; *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)) (irreparable injury where federal government's sovereign immunity precludes recovery of money damages); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (same); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) (same); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847,

44

849, 852 (9th Cir. 2009) (same); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) (same); *Temple Univ. v. White*, 941 F.2d 201, 214–5 (3d Cir. 1991) (same); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (same), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

The loss of federal funding will cause permanent injury to the City's health care system. Because BCHD's clinics rely on federal funding to provide services, the loss of that funding threatens their continued existence. As a district court in this circuit noted, irreparable harm is "likely" where a reproductive health clinic is closed. *Planned Parenthood of Central North Carolina v. Cansler*, 804 F. Supp. 2d 482, 499 (M.D.N.C. 2011) (granting preliminary injunction to Planned Parenthood against enforcement of a law that would have excluded it from receiving funding, including Title X funding, for contraception and teen pregnancy prevention). "[I]t would be extremely difficult, if not impossible, to reopen and re-establish client relationships at some point in the future" after "staff members are laid off and the clinic is closed." *Id*. And the longer an entity remains unable to receive federal funding and has to cut services, the greater the burdens to eventually reestablishing those services. *Id.*; *accord, e.g.*, *Planned Parenthood of Ind. v. Comm'r*, 699 F.3d 962 (7th Cir. 2012).

These harms are far from speculative: The City has seen firsthand the effects of service interruptions in underserved communities. In the early 1990s, federal funding to the City's STD clinics was reduced, decreasing the number of medical professionals and outreach personnel on staff. This, combined with the rise of crack-cocaine use and housing displacement of many poor residents, led to a 500% increase in syphilis infections across Baltimore. Greenbaum Decl. ¶ 6. Without treatment, syphilis and gonorrhea may lead to infertility. Syphilis also causes blindness, pelvic inflammatory disease (causing extreme pain in women), miscarriages, stillbirths, and

disabilities in infants. And HIV and hepatitis C, if left untreated, can be deadly. The progress that BCHD has made in preventing and treating HIV and STDs could be undone by a rule allowing refusals to provide care, setting our public-health efforts back by 20 or 30 years. *See* Greenbaum Decl. ¶¶ 67–72, 81, 84–86.

Likewise, cuts to family-planning services will lead to more unintended pregnancies and higher health costs. In 2010, services provided at Title X health centers in Maryland saved the state and federal government $147,766,000. These savings came from preventing unintended pregnancies, sexually transmitted diseases (including HIV), and cases of cervical cancer. At a national level, savings from Title X services totaled $7 billion that year. *See* Sangree Decl., Ex. E (Jennifer Frost et al, *Return on Investment: A Fuller Assessment of the Benefits and Cost Savings of the US Publicly Funded Family Planning Program*, Wiley Periodicals, Inc. (2014))

### C.     The Rule Will Harm the City as an Insurer.

The City's coffers will suffer as health care costs for its employees, retirees, and their families living all over the country increase as a result of the Rule. Stigmatizing refusals of health care nationwide will drive the City's insured away from preventive care and other appropriate treatment which can detect and treat infectious disease before it spreads or serious illness like cancer early. Early detection and treatment is less costly and results in better outcomes. Delays in accessing care will cause conditions to become acute and will increase costly emergency care and care for advanced conditions. These increased costs will be borne by the City.

### D.     The Establishment Clause Violation is Irreparable Harm as a Matter of Law.

Finally, "it is well established that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (brackets omitted). Hence, "[a]s a matter of law, the threat of an Establishment

Clause violation in and of itself constitutes irreparable harm." *Aziz v. Trump*, 234 F. Supp. 3d 724, 737 (E.D. Va. 2017) (citing *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)). For that reason alone, the need for a preliminary injunction is manifest.

## III.     The Balance of Equities and the Public Interest Favor an Injunction.

When a preliminary injunction is sought against the government, the balance-of-the-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public interest "lies with safeguarding public health." *Pashby*, 709 F.3d at 331. In particular, the Fourth Circuit recognizes the "robust public interest in safeguarding access to health care for those eligible for Medicaid," i.e., low-income individuals. *Id.* at 330–31.

The City has demonstrated that, absent an injunction, the City, its residents, and people across the country whom the City insures will all suffer irreparable harm. By contrast, Defendants face no injury from an injunction; it will merely preserve the status quo of accommodating conscience rights in medical care, subject to the rights of patients, while questions about the lawfulness of the Rule's drastic expansions are adjudicated. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("[T]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward."). "There is no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And "upholding the Constitution undeniably promotes the public interest." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 604 (4th Cir.), *as amended* (May 31, 2017) *vacated and remanded on other grounds in Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017).

**IV.     The Court Should Postpone the Rule's Effective Date or Issue a Nationwide Injunction.**

All relevant factors favor preliminary injunctive relief. Given the equities, the Court should stay the effective date of the Rule until a determination on the merits, pursuant to 5 U.S.C. § 705, or else issue a nationwide preliminary injunction enjoining the regulation from taking effect. An injunction solely as to the City of Baltimore would be insufficient to protect the City's interests for at least two reasons. First, the City insures individuals who live and travel in every state in the country, Gulhar Decl. ¶ 2, and if the Rule is allowed to take effect outside the City, these employees and retirees will experience denials of care that will result in worse health outcomes and higher costs for the City (as well as for patients). Second, if the injunction is limited to the City, or the State of Maryland, residents from surrounding states and the District of Columbia who lack the protection of the preliminary injunction, will increasingly rely on the City's already strained health care system as the Rule constricts health care in their own communities. A nationwide injunction is necessary to prevent the full scope of irreparable harm to the City that will occur if the Rule takes effect. *Virginia Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nationwide injunctions are appropriate if necessary to afford relief to the prevailing party.") *overruled on other grounds in The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544 (4th Cir. 2012); *Richmond Tenants Org. v. Kemp,* 956 F.2d 1300 (4th Cir. 1992) (nationwide injunction prohibiting eviction of public housing tenants without notice and a hearing was appropriate where plaintiffs were tenants from across the country). At minimum, the Court should stay the Rule's effective date pursuant to 5 U.S.C. § 705.

## CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court grant its Motion for Preliminary Injunction.

DATED:  June 12, 2019                          Respectfully submitted,

                                               By: */s/ Andre M. Davis*
                                               Andre M. Davis #00362
                                               Baltimore City Solicitor
                                               Suzanne Sangree #26130
                                               Senior Public Safety Counsel and
                                               Director of Affirmative Litigation
                                               BALTIMORE CITY
                                               DEPARTMENT OF LAW[14]
                                               City Hall, Room 109
                                               100 N. Holliday Street Baltimore, MD 21202
                                               Tel: (443) 388-2190
                                               andre.davis@baltimorecity.gov
                                               suzanne.sangree2@baltimorecity.gov

                                               Arun Subramanian (pro hac vice pending)
                                               Seth Ard (pro hac vice pending)
                                               Elisha Barron (pro hac vice pending)
                                               Ryan C. Kirkpatrick (pro hac vice pending)
                                               SUSMAN GODFREY L.L.P.
                                               1301 Avenue of the Americas, 32nd Fl
                                               New York, New York 10019
                                               Tel.: (212) 336-8330
                                               asubramanian@susmangodfrey.com
                                               sard@susmangodfrey.com
                                               ebarron@susmangodfrey.com
                                               RKirkpatrick@susmangodfrey.com

                                               Daniel Shih (pro hac vice pending)
                                               SUSMAN GODFREY L.L.P.
                                               1201 Third Avenue, Suite 3800
                                               Seattle, Washington 98101
                                               Tel.: (206) 516-3880
                                               dshih@susmangodfrey.com

---

[14] Jane Lewis, Assistant Solicitor, Baltimore City Law Department, on the brief, admission pending to the bar of the United States District Court for the District of Maryland.

Richard B. Katskee #27636
Kenneth D. Upton, Jr. (admitted pro hac vice)[15]
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234
katskee@au.org
upton@au.org

**ATTORNEYS FOR PLAINTIFF**

---

[15] Admitted in Texas and Oklahoma only. Supervised by Richard B. Katskee, a member of the D.C. Bar.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 12, 2019 the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*/s/ Suzanne Sangree*
Suzanne Sangree
